Michael C. McKay, Esq. (023354)
**MCKAY LAW, LLC**
5635 North Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law
[Additional Counsel Identified Below]

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Hagins, and Tommie Woodard, individually and on behalf of the Knight-Swift Transportation Retirement Plan,<br><br>Plaintiffs,<br><br>vs.<br><br>Knight-Swift Transportation Holdings, Inc.<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

On behalf of the Knight-Swift Transportation Holdings, Inc. Retirement Plan ("Plan"), Robert Hagins and Tommie Woodard ("Plaintiffs") file this Class Action Complaint against Knight-Swift Transportation Holdings, Inc. ("Defendant") for breaching its fiduciary duties of prudence in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

**BRIEF OVERVIEW**

1.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

2.      In a defined contribution plan, "'participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).

3.      Because all risks related to high fees and poorly performing investments are borne by the plan participants, the employer has little incentive to keep costs low or to closely monitor a plan to ensure every investment remains prudent.

4.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. *See* 29 U.S.C. § 1104(a)(1)(B).

5.      Excessive fees can dramatically reduce the benefits available when a plan

participant is ready to retire. Over time, even small differences in fees can compound and result in a vast difference in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

6.     The impact of excessive fees on retirement assets is dramatic. The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September 2019).

7.     Plaintiffs are Plan participants. As of December 31, 2021, the Plan had $432,416,489 in assets and 14,426 total participants. Instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendant caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services. Defendant also selected and retained for the Plan high priced investments when identical investments were available to the Plan at a fraction of the cost.

8.     Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## **JURISDICTION AND VENUE**

9.     This Court has exclusive jurisdiction over the subject matter of this action

under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

10.    This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered.

11.    Venue is proper in this District because Defendant is headquartered in Phoenix, Arizona.

**THE PLAN**

12.    The Plan is subject to the provisions of ERISA.

13.    Defendant established the Plan in 1992. The Plan has been amended at various times over the years. The Plan was last amended on July 13, 2020, to incorporate provisions of the CARES Act of 2020.

14.    The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

15.    The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

16.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

17.    Principal Life Insurance Company ("Principal") is the recordkeeper for the Plan. Principal has been the recordkeeper during all relevant times.

18.    Notably, substantially all of the Plan's investments are shares of mutual and/or collective trust funds managed by Principal (or its affiliates). The management

fees and operating expenses, including in some instances, other fees, are charged to the Plan via investments in the Principal managed mutual funds within the Plan. Such fees are deducted by Principal directly from Plan participant individual accounts. Such deductions are not separately reflected in any disclosures to Plan participants. Consequently, it is very difficult, if not impossible, for Plan participants to know how much Principal deducts from their individual accounts for such fees. In many instances, Principal does not disclose to Defendant how much fees it collects from Plan participants. Consequently, Defendant does not know the actual amount of compensation Principal collects from the Plan.

## **THE PARTIES**

### ***Plaintiffs & Standing***

19. Plaintiffs are participants in the Plan under 29 U.S.C. §1002(7) because they and their beneficiaries are or may become eligible to receive benefits under the Plan.

20. In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, Plaintiffs allege no individual injuries distinct from Plan injuries.

21. Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

22.     To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured and continue to be injured by Defendant's unlawful conduct.

23.     To establish standing, Plaintiffs need only show a constitutionally adequate injury flowing from those decisions or failures. Plaintiffs allege such an injury for each claim. Plaintiff have standing because the challenged conduct, including Defendant's actions resulting in Plaintiff and the Plan participants paying excessive recordkeeping and administrative fees, and being limited to investing in expensive investments when identical investments were available at a lower cost. All Plan participants were affected by Defendant's imprudence in the same way.

24.     For example, Plaintiffs' individual accounts in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

25.     All class members have standing for the same reason. Each class member's individual account in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

*Defendant*

26.     Defendant is the Plan Sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a ) it is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

27.     Defendant is also a fiduciary to the Plan because it is the Plan Administrator and it exercised authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the disposition of Plan assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):[1]

> All persons who were participants or beneficiaries of the Plan, at any time between October 18, 2016, and the present (the "Class Period").

29.     Class members are so numerous that joinder is impractical. According to the most recent Form 5500 filed with the DOL, there were 14,426 participants in the Plan with account balances as of December 31, 2021.

---

[1] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

30.     Plaintiffs' claims are typical of the claims of the Class. Like other Class members, Plaintiffs participated in the Plan and suffered injuries because of Defendant's ERISA fiduciary breaches. Defendant treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices and all Class members have been similarly affected by Defendant's wrongful conduct.

31.     There are questions of law and fact common to the Class. These questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendant is fiduciary of the Plan;

B.     Whether Defendant breached its fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether Defendant failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of relief.

32.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other Class members. Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

33.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because

prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other Class members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

34.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because Defendant has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### DEFENDANT'S FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

35.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

36.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or

indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

37.     As described above, Defendant was (and still is) a fiduciary of the Plan because:

       A.     it so named; and/or

       B.     exercised authority or control respecting management or disposition of the Plan's assets; and/or

       C.     exercised discretionary authority or discretionary control respecting management of the Plan; and/or

       D.     had discretionary authority or discretionary responsibility in the administration of the Plan.

38.     As a fiduciary, Defendant is required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)(A), to manage and administer the Plan solely in the interest of the Plan's participants and beneficiaries, prudently defray costs of the Plan, and to do so with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as the Plan. *Id.* These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

39.     As set forth in detail below, Defendant breached its fiduciary duties of prudence to the Plan, Plan participants, and Plan beneficiaries, and Defendant is therefore liable for its breaches under 29 U.S.C. §§ 1104, 1109, and 1132.

## SPECIFIC ALLEGATIONS

### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

40.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7; *see also* 29 U.S.C. § 1104(a)(1)(A) (requiring ERISA fiduciaries to "defray reasonable expenses of administering the plan.").

41.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

---

[2] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited October 16, 2022).

42.     Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

43.     Indeed, the DOL has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

44.     The duty to evaluate and monitor plan expenses, investments and investment costs, includes fees paid by plan participants to third party service providers. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[3] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

### *Defendant Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses*

45.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a plan by a plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper

---

[3] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited October 3, 2022).

to provide a range of services to a plan as part of a package of services. These services typically include, preparation of individual account statements, delivery of individual account statements, claims processing, participant communications, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, and preparation of ERISA required disclosures to participants and regulators.

46.     Nearly all recordkeepers in the marketplace offer the same range of services. The services are essentially the same.

47.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price, rather than differentiating themselves based on the quality or range of services offered.

48.     Individual plan participants cannot negotiate with recordkeepers on behalf of the Plan. That responsibility falls to the Plan's fiduciaries – in this case Defendant. ERISA explicitly requires plan fiduciaries to prudently defray plan expenses. 29 U.S.C. 1104(a)(1)(A).   Accordingly,   prudent   fiduciaries   routinely   bargain   for   low recordkeeping fees. *See, e.g.*, *George v. Kraft Foods Global, Inc*., 641 F.3d 786 (7th Cir. 2011) (expert opined market rate for large plans is approximately $20–$27 per plan participant); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping); *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (Doc. 562-2, Jan. 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years).

49.     The cost of providing recordkeeping services primarily depends on the number of participants in a plan, rather than the range of services provided to the plan. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis. Plans with large numbers of participants can and do take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

50.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within a plan, typically mutual funds. A percentage of all the money invested by plan participants in mutual funds is removed from the plan participants' individual accounts and diverted to the recordkeeper – ostensibly, to pay for plan administrative expenses. The money taken from Plan participants via revenue sharing is not disclosed in a dollar amount, percentage, or any other meaningful way on any account statements or other documents provided to Plan participants.

51.     Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiffs are not making a claim against Defendant merely because it used revenue sharing to pay administrative expenses.

52.     However, when (as here) revenue sharing is left unchecked, it can be devastating for plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans

by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[4]

53.     Because revenue sharing payments are asset based, they bear no relation to actual services provided and, likewise, bear no relation to a reasonable recordkeeping fee, and can provide excessive compensation by plan participants to recordkeepers.

54.     Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to a plan; but rather, to a percentage of assets in a plan and/or investments in mutual funds in a plan. As the assets in a plan increase, so too increases the recordkeeping fees that the recordkeeper pockets from the plan and its participants.

55.     One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket and paying the plumber based not on actual work provided but, rather, based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

56.     For example, assume a plan had two participants. The two plan participants each had individual accounts in the plan with $1,000 invested. The plan contracted with a recordkeeper who agreed that $25 per participant, per year, was a fair and reasonable fee for recordkeeping. But instead of charging each participant $25

---

[4]  Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited October 17, 2022).

directly each year, the plan agreed that the recordkeeper would collect its fee by assessing a 250-basis point fee to each plan participant for all assets under management in the plan – the amount equals the agreed upon $25.00 per participant, per year fee. Assume, as time passes the two participants' individual accounts increase in value from $1,000 to $1,000,000. If the recordkeeper's fee is not renegotiated, the recordkeeper will collect $25,000 per year, per participant, instead of the fair and reasonable $25.00 per year, per participant fee. The services the recordkeeper provides to the two participants does not change. But the recordkeepers' fees skyrocket to astronomically excessive levels solely because the assets in the two individuals' hypothetical accounts increased.

57.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

58.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the

recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

59.     Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper, or other often surreptitious forms of compensation pocketed by the recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

60.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear

high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

61.     The Plan's assets under management have exploded over the past six years. Defendant reported in DOL filings that for the year end 2016 the Plan had $192,273,065 in assets under management. The Plan's assets under management was $432,416,489 for the year ending 2021. The Plan's assets have more than doubled and increased by more than $240,000,000 in the past six years alone. Because Principal is compensated via revenue sharing, the compensation Principal receives from the Plan has exploded too.

62.     The direct and indirect payments Defendant caused the Plan, participants, and beneficiaries to make for recordkeeping and administrative services during the Class Period were excessive and unreasonable. Defendant breached its duty of prudence by failing to monitor, control, negotiate, and otherwise ensure that indirect compensation Plan participants' pay to Principal not excessive and unreasonable.

63.     All national recordkeepers, like Fidelity, Empower, Schwab, etc., have the capability to provide recordkeeping services at relatively little cost to defined contribution plans, like the Plan here.

64.     There is nothing to indicate that Defendant has undertaken a proper RFP since 2016. If Defendant had undertaken an RFP to compare Principal's compensation with those of others in the marketplace, Defendant would have recognized that Principal's compensation during the Class Period has been (and remains) unreasonable and excessive.

65.     Additionally, as noted above the Plan had more than $432,416,489 in assets under management as of December 31, 2021. This is Plan participant money. Defendant agreed that anytime Plan participants deposit or withdraw money from their individual accounts the money will first pass through a Principal clearing account. The money typically stays with Principal for 2-5 days.

66.      Defendant reported for the year 2021, $60,371,838 was added to Plan participants' individual accounts and $51,124,752 was withdrawn from Plan participants' individual accounts. Accordingly, the total added and withdrawn in 2021 was $111,496,590.

67.     Principal earned income on $111,496,590 of Plan participant money while it was in Principal's clearing account. This is another form of indirect compensation that Principal receives as the recordkeeper for the Plan. However, Defendant has not tracked, monitored, or negotiated the amount of compensation Principal receives from income it earns on Plan participant money in Principal's clearing account. Moreover, Defendant does not even know how much Principal pockets from this source of indirect compensation. Defendant breached its fiduciary duty of prudence by allowing Principal to receive excessive and unreasonable compensation from Plan participants and without

even knowing the amount of compensation Principal collects from interest on participant money.

68.     Principal also receives "direct compensation" from Plan participants. Indeed, as disclosed on the Plan's 5500 disclosure for the year ending 2021, as filed with the DOL, the Plan paid Principal $1,209,051 in "direct compensation" during 2021. The 5500 disclosure also provides that there were 14,426 Plan participants with account balances at the year ending 2021. Accordingly, the Plan paid Principal $83.81 per participant in "direct compensation" for recordkeeping services in 2021. ($1,209,051 / 14,426 = $83.81). The $83.81 per participant fee does not include "indirect compensation" via revenue sharing, float interest, etc. that Principal collects from the Plan. Indeed, the Plan's 5500 disclosure for the year ending 2021, confirms that Principal receives "indirect compensation" in addition to its "direct compensation."

69.     Plans of similar size pay annually no more than $25-$30 per participant annually in total for recordkeeping fees. Thus, the direct compensation that Principal received was – on a stand-alone basis – excessive. Here, the direct compensation alone was nearly triple what a reasonable fee should have been.

70.     But it gets worse. As noted above, Principal did not receive only direct compensation from the Plan, it received even more compensation through revenue sharing payments and through float income.

71.     As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. Again, this is because most revenue sharing is asset-

based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

72.     The best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not unfairly increase based upon an increase in assets in the plan.

73.     The total amount of recordkeeping fees paid by the Plan (both through direct and indirect payments) currently is at least $200 per participant annually, when a reasonable fee ought to be no more than $25 per participant annually.

74.     The recordkeeping fees paid to Principal are far greater than recognized reasonable rates for a plan with more than $400,000,000 in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace, the Plan could have obtained recordkeeping services that were comparable to the typical services that would have been provided to the Plan by Principal. Principal performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.).

75.     Principal's compensation was excessive in relation to the services it provided because, in fact, the services that Principal provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive compensation being paid to Principal and taken corrective action.

76.     Looking at Principal's compensation compared to recordkeeping costs for other plans of a similar size shows that the Plan was paying significantly higher fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

77.     By way of example, Fidelity acts as the recordkeeper for Molson Coors Beverage Company USA, LLC ("Molson Plan"). The Molson Plan filed a Form 5500 disclosure for the year ending 2020 that shows it had 2,948 plan participants, $455,926,00 of assets under management in the plan. The plan's participants paid $9.42 per participant annually for recordkeeping. The services Fidelity provides to the Molson Plan are virtually identical to those provided by Principal to the Plan here.

78.     However, Defendant permitted Principal to charge the Plan in this case $83.81 in "direct fees" per participant annually, or nearly ten times what Fidelity charged the Molson Plan, for basically the same services, making the fees charged to this Plan, in this case, excessive. And when Principal's indirect compensation from revenue sharing and float income is factored, it is beyond any good faith dispute that Principal's fees are excessive by any reasonable measure.

79.     Considering that the recordkeeping services provided by Principal in this case are similar to those provided by all national recordkeepers, like Schwab, Empower,

and Fidelity, Defendant's flawed decision-making process caused the Plan and its participants to pay more than $200 per participant in annual compensation to Principal is imprudent. Defendants have a statutory duty to defray Plan expenses. Defendant failed to do so.

80.     Defendant either engaged in little to no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly sized 401(k) plans, or it was complicit in paying grossly excessive fees. Had Defendant conducted a meaningful examination, comparison, or benchmarking, as any prudent fiduciary would, Defendant would have known that the Plan was compensating Principal at an inappropriate level. Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings since the extra fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

81.     By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendant breached its fiduciary duties to the Plan.

### *Defendant Breached Its Fiduciary Duties by Selecting More Expensive Share Classes Instead of Low-Cost Institutional Shares of the Same Funds*

82.     The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove

imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

83.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

84.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts Ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

85.     Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

86. A single mutual fund usually offers more than one "class" of its shares. Each share class represents investments in the same mutual fund portfolio. The key distinction among share classes are the sales charges and ongoing fees and expenses investors pay in connection with investments in the fund. Retirement plans, like the Plan here, qualify for the best-priced share classes because mutual funds want to entice retirement plans to offer their funds on plan investment menus, which given the economies of scale, often results in hundreds of millions of dollars invested in a given fund.

87. Defendant failed to prudently monitor the Plan to determine whether the Plan was invested in the prudent share class available for the Plan's mutual funds.

88. By causing Plan participants to pay more for identical investments, Defendant failed in its statutory ERISA duty to prudently defray costs of the Plan. The chart below demonstrates how much more expensive the share classes in the Plan are than available identical fund better priced share classes:

| Fund in Plan | Expense Ratio | Lower Cost Share Class of <u>Same Fund</u> | Expense Ratio |
|---|---|---|---|
| ABALX<br>Am Balanced Fund<br>Class A | **0.56%** | RLBGX<br>Am Balanced Fund<br>Class R6 | **0.25%** |
| SMCWX<br>Am Small Cap World<br>Class A | **1.02%** | RLLGX<br>Am Small Cap World<br>Class R6 | **0.65%** |
| CWGIX<br>Cap World Growth<br>Class A | **0.75%** | RWIGX<br>Cap World Growth<br>Class R6 | **0.40%** |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of <u>Same Fund</u> | Expense Ratio |
|---|---|---|---|
| AEPGX<br>EuroPacific Growth<br>Class A | **0.80%** | RERGX<br>EuroPacific Growth<br>Class R6 | **0.46%** |
| AMUSX<br>Am Gov Securities<br>Class A | **0.62%** | RGVGX<br>Am Gov Securities<br>Class R6 | **0.22%** |
| AIVSX<br>Invest Co of Am<br>Class A | **0.58%** | RICGX<br>Invest Co of Am<br>Class R6 | **0.27%** |
| ANEFX<br>New Economy Fund<br>Class A | **0.74%** | RNGGX<br>New Economy Fund<br>Class A | **0.41%** |
| ANWPX<br>New Perspective Fund<br>Class A | **0.72%** | RNPGX<br>New Perspective Fund<br>Class R6 | **0.41%** |
| AWSHX<br>Wash Mutual Inv Fund<br>Class A | **0.56%** | RWMGX<br>Wash Mutual Inv Fund<br>Class R6 | **0.26%** |
| JGSVX<br>JP Morgan Small Cap<br>Class R5 | **0.85%** | JGSMX<br>JP Morgan Small Cap<br>Class R6 | **0.74%** |

89.     As of December 31, 2021, Plan participants had nearly $200,000,000 invested in the above identified imprudent share classes. Plan participants, in most cases, are paying about double to invest in the imprudent share classes. This is a waste. This is a plain and obvious massive fiduciary breach. Defendant's imprudence is on full display by causing Plan participants to pay millions in unnecessary fees.

90.     Defendant should have known of the existence and availability of lower-cost share classes. Yet, Defendant selected and retained the more expensive share classes. This is akin to Principal publicly offering the Plan the option to purchase an

investment for $1 and the Plan instead agreeing to purchase the identical investment for $2.

91.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the prudent share classes available and selected those for the Plan instead of the identical but higher-priced share classes.

92.     There is no good-faith explanation for selecting and retaining the higher-priced and poorly performing share classes when the lower-priced and better performing share classes were available. The Plan did not receive any additional services or benefits based on its stagnate continuation of the more expensive share classes. The only difference between the two was higher price and lower returns.

**FIRST CLAIM FOR RELIEF**
***Breach of Fiduciary Duties of Prudence***

93.     Plaintiffs re-allege and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

94.     As a fiduciary of the Plan, Defendant is/was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

95.     Defendant breached its fiduciary duties in multiple respects as discussed throughout this Complaint. Defendant failed to monitor or control the grossly excessive compensation paid to Principal. Defendant failed to select prudent share classes for the Plan.

96.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

97.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### *Failure to Adequately Monitor Other Fiduciaries*

132.     Plaintiffs re-allege and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

133.     Defendant is the Plan Sponsor, as defined by ERISA. Defendant had the authority and obligation to monitor all other fiduciaries for the Plan. Defendant's Board of Directors appointed individuals to serve on the Retirement/Deferred Compensation Plan Administrative Committee ("Committee") to serve as fiduciaries of the Plan and at the discretion of Defendant's Board of Directors. Defendant, and its Board of Directors,

were aware that the Committee had critical responsibilities as a fiduciary of the Plan. Indeed, the Plan's DOL 5500 disclosures provide, the Committee "is responsible for the oversight of the Plan and determines the appropriateness of the Plan's investment offerings and monitors performance."

134.    Defendant, as Plan Sponsor, had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

135.    Defendant also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

136.    Defendant breached its fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

    (b)    failing to monitor the processes by which the Plan's expenses and investments were evaluated; and

(c)     failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

137.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

138.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in his Prayer for Relief.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

1.     Find and declare that the Defendant breached its fiduciary duties as described above;

2.      Find and adjudge that Defendant personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary

duty;

3.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.      Remove fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiffs as class representatives, and appoint their counsel as Class Counsel;

9.      Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED: October 25, 2022              Respectfully submitted,


By: */s/ Michael C. McKay*
       Michael C. McKay, Esq.
       **MCKAY LAW, LLC**
       5635 N. Scottsdale Road, Suite 170

Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

Marc R. Edelman, Esq.
*Pro Hac Vice application forthcoming*
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: (813) 223-5505
Email: MEdelman@forthepeople.com

Brandon J. Hill, Esq.
Luis A. Cabassa, Esq.
*Pro Hac Vice applications forthcoming*
**WENZEL FENTON CABASSA, P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Telephone: (813) 224-0431
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com

*Attorneys for Plaintiffs and the proposed
Class*